JAMES McGALE *et al. vs.* JOHN J. McGALE *et als.*

| 18 | 675 |
| 19 | 14 |
| 19 | 64 |

Pub. Laws R. I. cap. 365, of March 27, 1874, provided for a division of the town of North Providence and the annexation of a part of it to the town of Pawtucket and a part to the city of Providence. By the terms of the act, the question of its adoption was to be submitted to the voters of the towns of North Providence and Pawtucket on the first Wednesday in April, 1874. On that date a majority of the voters of the two towns voted in favor of its adoption, and the act took effect as therein provided, May 1, 1874. By § 18 of the act it was enacted that all proceedings pending or commenced before the Court of Probate of North Providence prior to the adoption of the act, should be transferred to, continued by, and concluded according to law by the Court of Probate of Pawtucket as organized by the act.

March 21, 1874, petitions for the appointment and approval of a guardian of minors who were then residents of North Providence, in that part of it which, when the act took effect, was annexed to the city of Providence, were presented to the Court of Probate of North Providence, and by it referred for consideration to April 11, 1874, but were not acted on by that court. May 20,

1874, the Court of Probate of Pawtucket heard the petitions and appointed one G. as guardian of the minors. Subsequently, G. having resigned his office as guardian, the Court of Probate of Pawtucket appointed one M. as guardian in his stead, and by a decree made October 21, 1874, on the petition of M., authorized him as guardian to sell real estate of his wards. M. accordingly sold the real estate and gave a guardian's deed to the purchaser.

*Held*, that Pub. Laws R. I. cap. 365, was adopted on the first Wednesday in April, 1874, when the voters of North Providence and Pawtucket voted for its adoption.

*Held*, further, that as the petitions presented to the Court of Probate of North Providence, March 21, 1874, were pending before that court at the time of the adoption of the act, the proceedings were transferred to the Court of Probate of Pawtucket, which court, by taking action on the petitions after the act had taken effect, and appointing G. as a guardian, acquired jurisdiction over the estates of the wards, and consequently retained jurisdiction to accept the resignation of G. as guardian, to appoint M. as his successor in office, and to authorize M. on his petition to sell the real estate of his wards.

Gen. Stat. R. I. cap. 168, § 15, provided that every guardian empowered by a Court of Probate to sell his ward's property shall give a bond "that he will apply the proceeds of such sale to the purposes for which the same was allowed to be made, and invest the same, or the surplus thereof, as the case may be, in other real estate, or (specifying several modes in the alternative) or in such other manner as the court may direct."

A guardian having been empowered by a Court of Probate to sell his ward's lands for the purpose of paying debts and investment, with a direction in the decree to apply, use and invest the proceeds in such manner as should be approved by the court, gave a bond, the condition of which, after reciting that he had been empowered to sell for the purpose of paying debts and investment, was to "apply and appropriate the proceeds received from said sale to the purposes aforesaid . . . . . . and . . . . . . in all things comply with the decree of said court authorizing said sale, and with the advice and direction of said court in relation to the premises," without setting out the alternative modes of investment specified in the statute.

*Held*, that the bond was in substantial compliance with the statute.

A bond to invest the proceeds or surplus in either of the modes specified by the statute would be sufficient.

That portion of Gen. Stat. R. I. cap. 168, § 16, which provided that no resignation of any guardian shall be accepted by a Court of Probate until he "shall have settled his accounts with said court," has no application to a guardian when no estate of his ward has come to his possession.

A Court of Probate issued a letter of guardianship, which is on record, wherein it is recited that the appointee had given bond as required by law.

*Held*, that the recital in the letter of guardianship is record evidence that a bond has been given.

*Held*, further, that as the letter of guardianship could not have been properly issued until a bond had been filed, it is to be presumed that the bond was filed.

The owner of a lot of land subject to a mortgage died intestate, May 3, 1873. His widow was appointed administratrix on his estate, and took up the mortgage, which was transferred to her July 10, 1873, but was never discharged of record. Shortly afterwards she died intestate. The heirs and next of kin of

the husband and wife were their children. The title to the lot being brought in question on the foregoing facts in proceedings in 1894,

*Held*, that as no facts appeared which would make it for the interest of the children to have the mortgage kept alive, and no possible claims which could be enforced against the mortgage were shown to exist, the mortgage and the equity of redemption had merged in the children, and the mortgage lien was extinguished.

BILL IN EQUITY for partition. On motion of the commissioner appointed to sell the land, for an order on the purchaser to pay the purchase money and take a deed.

The bill was filed March 22, 1894. The commissioner appointed to sell the land, which consisted of several lots, applied to the court for an order July 3, 1894. The lot in question was formerly owned by one Patrick McEvay, who died intestate, May 3, 1873, seized and possessed thereof subject to a mortgage. The lot was afterwards sold by the guardian of the children of said Patrick McEvay, under a decree of a Court of Probate, to a purchaser through whom the parties to this bill derive title.

*July* 28, 1894. MATTESON, C. J. The commissioner in this case, appointed to make sale of land described in the bill, has applied for an order against Thomas Grimes, the purchaser of one of the lots, to pay the purchase money and take a deed of the lot. The purchaser opposes the application, and has filed a statement of the particulars in which he deems the title to the lot defective. The lot in question is situated in that part of Providence set off from North Providence, and is the same delineated as Lot 69 on the Bellevue Plat, by Cushing & Farnum, 1854, recorded in the land records of Providence on Plat Card No. 306.

The objections to the title are as follows :—

1. That the decree of the Court of Probate of Pawtucket, dated October 21, 1875, authorizing Matthew H. McEvay, guardian of the minor children of Patrick and Catherine McEvay, to sell the lot, was not in conformity to Gen. Stat. R. I. cap. 168, § 11, and was an order beyond the jurisdiction of the Probate Court to make.

Gen. Stat. R. I. cap. 168, §§ 10, 11, 12,[1] were as follows :

[1] Re-enacted Pub. Stat. R. I. cap. 179, §§ 10, 11, 12.

"SEC. 10. Such courts (i. e. Courts of Probate) shall have power to examine into and grant the petitions of executors and administrators, for authority and license to sell, at public auction only, the lands, tenements and hereditaments of deceased persons, or growing wood, or timber, or stone, or peat, or coal thereon, to pay the debts of such deceased, the expense of their funerals, of supporting their families, and settling their estates, with incidental charges.

" SEC. 11. They shall, in like manner, have power to examine into like petitions of guardians to sell, at public or private sale, or to mortgage, like property, or any mixed estates, and all estates of their wards necessary to be conveyed as real estate, to pay their debts, the expenses of supporting them and their families, or for any other purpose whatsoever, including the making of a better and more advantageous investment, and the settlement of their estates, with incidental charges.

" SEC. 12. The petitions in the two sections next preceding mentioned shall be granted under such restrictions and limitations, and upon such conditions, as are or may be imposed by law, or in addition thereto, as the court in granting the same may direct."

The petition of the guardian set forth that there were debts due from his wards to the amount of about $2,300 ; that their personal estate was insufficient for the payment of the debts which they owed ; that they were seized and possessed of two certain lots of land, one of which was the lot in question, and prayed that the guardian might be empowered to sell the real estate or so much as might be necessary to pay the debts of the wards, with incidental charges. The petition was presented to the court on October 1, 1875, and received and referred to October 20, 1875, at 7 o'clock P. M., for consideration, with an order of notice, and on October 21, 1875, an order was made granting leave to the guardian to sell the land at private sale, and directing him to apply, use and invest the proceeds in such manner as should be approved by the court, and to give bond to comply with the order in the sum of $4,800. We fail to perceive wherein

this order is not in conformity to the section of the statute referred to in the objection.

Was it beyond the jurisdiction of the Court of Probate to make? By Gen. Stat. R. I. cap. 154, §§ 3, 4[1], it was necessary to give jurisdiction to a Court of Probate to appoint or to approve of the choice of a guardian, that the minor should reside or have a legal settlement in the town. Prior to the division of North Providence and the annexation of a part of it to Pawtucket and a part of it to Providence, the wards had resided in North Providence. By that division the territory in which they resided was transferred to Providence, so that they became residents of Providence. By the act for the division, Pub. Laws R. I. cap. 365, of March 27, 1874, § 18, it was enacted that all proceedings pending or commenced prior to the adoption of the act by the towns of North Providence and Pawtucket, as provided in it, before the Court of Probate of North Providence, should be transferred to, continued by, and concluded according to law by the Court of Probate of the town of Pawtucket, as organized by the act. The question of the adoption of the act was, by its terms, to be submitted to the voters of the towns of North Providence and Pawtucket on the first Wednesday in April, 1874, and a majority of the voters qualified to vote on the question having voted in favor of the adoption on that date, the adoption must be considered as of that date. The agreed statement of facts shows that the petitions for the appointment of Charles E. Gorman as guardian of such of said minors as were under the age of fourteen years, and to approve of him as the choice as guardian of such of said minors as were more than fourteen years of age, were presented to the Court of Probate of North Providence on March 21, 1874, at which date the minors were residents of North Providence, and by it referred for consideration to April 11, following, with an order of notice. These petitions were not acted on by the Court of Probate of North Providence, presumably because Pub. Laws R. I. cap. 365, was in fact adopted prior to the

---

[1] Re enacted Pub. Stat. R. I. cap. 168, §§ 3, 4.

date to which they were referred for consideration. Whether this be so or not, the proceedings, not having been acted on, were pending before the Court of Probate of North Providence at the time of the adoption of said chapter, and by § 18 of it were transferred to the Court of Probate of Pawtucket. The latter court, on May 20, 1874, Pub. Laws R. I. cap. 365 having taken effect on May 1, 1874, heard and granted the petitions. There can be no doubt that the Court of Probate of Pawtucket thus acquired jurisdiction over the estates of the minors, and having thus acquired jurisdiction we think there can be no doubt that it retained it, since there is no provision of law by which that jurisdiction, so acquired, has been taken away and transferred to any other tribunal. When, therefore, Mr. Gorman subsequently, on January 20, 1875, resigned his office as guardian, the Court of Probate of Pawtucket, under Gen. Stat. R. I. cap. 168, § 26, properly accepted the resignation, and took cognizance of the petitions for the appointment and approval of Matthew H. McEvay as guardian in his stead, and having appointed him as such guardian, it had jurisdiction to make the decree in question, on his application to sell the real estate of his wards.

2. That the bond given by said Matthew McEvay as guardian, under and by virtue of said order, was void, because the same appears on its face not to have been given in compliance with Gen. Stat. R. I. cap. 168, § 15[1], which was as follows :—

"Every executor, administrator and guardian empowered to sell as aforesaid shall, before making sale, give bond with surety to the satisfaction of the court, which bond shall be duly recorded in the Court of Probate approving the same, in a book to be kept for that purpose, that he will apply the proceeds of such sale to the purposes for which the same was allowed to be made, and invest the same, or the surplus thereof, as the case may be, in other real estate, or in mortgages on real estate, or in productive stocks, or he may de-

---

[1] Re-enacted Pub. Stat. R. I. cap. 179, § 15.

posit the same on interest with any institution for savings in this state, or in such manner as the court may direct."

We are of the opinion that the bond given by the guardian was in substantial compliance with the statute. Its condition recites that the guardian has on his petition been authorized and empowered by the court to sell the real estate of the minors at private sale for the purpose of paying debts and investment ; it then goes on to provide that, "If the said McEvay doth well and truly apply and appropriate the proceeds received from said sale to the purposes aforesaid, and doth render unto said court a just and true account of said proceeds whenever thereunto lawfully required, and doth in all things comply with the decree of said court authorizing said sale, and with the advice and direction of said court in relation to the premises, then the before-written obligation to be void and of no effect, otherwise to be and remain of full force and virtue." The bond is a bond to apply the proceeds for the purposes for which the sale was allowed to be made, to wit, the payment of the debts of the wards. So far it is in literal compliance with the statute. It goes on to require the guardian to account for the proceeds of the sale whenever required, and *to comply with the decree of the court authorizing the sale and with the advice and direction of the court in relation to the premises.* A bond, the condition of which should set forth the alternative modes of investment specified in the statute, would doubtless be more artistic. But we think that it is not necessary that the bond should cover all the various modes. A bond to invest the proceeds or surplus, as the case may be, in either of those modes would be a sufficient compliance with the statute. One of the modes specified is in such manner as the court may direct. The language of the condition of the bond before us, "to comply with the advice and direction of the court in relation to the premises," is practically equivalent to saying that the guardian shall invest the surplus in such manner as the court shall direct, and besides, the condition also requires the guardian "to comply with the decree of the court authorizing the sale," and that decree contained a direction to apply,

use and invest the proceeds in such manner as should be approved by the court.

3. That it appearing on the records that Matthew H. McEvay was in fact appointed guardian prior to the time that the resignation of Charles E. Gorman, the guardian previously appointed, had been accepted, and prior to the settlement of the account of said Gorman as guardian with the Probate Court of Pawtucket, said McEvay was never appointed guardian.

. Gen. Stat. R. I. cap. 168, § 26[1], provided that "whenever any administrator or guardian appointed by any court of probate, or any executor of any will approved by any court of probate, shall, in writing, resign his trust to the court appointing him, such court may accept such resignation and appoint a successor, who shall have all the power that the person resigning had; but no resignation shall be accepted until the person resigning shall have settled his accounts with said court."

We do not deem this a valid objection. The record discloses that no estate of the minors came to the possession of Mr. Gorman, the first guardian. No estate having come to his possession, he had no account to settle, and having resigned his office as guardian, the court was at liberty, and it was its duty, to appoint his successor. The fact that subsequently to his resignation and to the appointment of Mr. McEvay, an affidavit of Gorman that no estate of the wards had come to his hands was received by the court and entered on its record, perhaps for the purpose of explaining the absence of any account, does not affect the question.

4. That it appearing that no guardian's bond, given by said Matthew H. McEvay as guardian, is to be found on file among the original papers of said estates, or recorded in the records of the Probate Court of Pawtucket as required by law, said Matthew H. McEvay was never legally qualified to act as guardian.

We do not think that the failure of the court to perform

---

[1] Re-enacted Pub. Stat. R. I. cap. 179, § 26.

its duty in the recording of the bond would invalidate the appointment of a guardian or disqualify him to act.

Nor do we think that the fact that the bond is not to be found on file is sufficient to show that one was not given, and therefore to show that the guardian was never legally qualified to act. There is record evidence that such a bond was given. The letter of guardianship, which is on record, is in the usual form. It is addressed to Matthew H. McEvay, and proceeds: "You having this day been approved as guardian of (here follow the names of the wards and the statement that certain of them were over and the others under fourteen years of age, and that they are the children of Patrick McEvay) *and having given bond* according to law, are hereby authorized," &c. This is a solemn declaration of the court to the effect that Mr. McEvay had qualified himself to act as guardian by the giving of the bond, and afterwards the court recognized him as qualified to act by entertaining his petition for leave to sell the real estate of his wards.

Again, as the letter of guardianship could not have been issued properly by the court until the bond of the guardian had been filed, it is to be presumed that the bond was filed, in accordance with the maxim, *omnia præsumunter rite et solemniter esse acta, donec probetur in contrarium;* and see *Andrews* v. *Goff*, 17 R. I. 205.

5. Because there is a mortgage on the land, of record and not discharged, made by Patrick McEvay, father of the minors and the owner of the land at the time it was made, to John B. Hennessey, dated November 26, 1872, and recorded December 16, 1872, which mortgage was afterwards transferred by said Hennessey to Catherine McEvay, the widow of said Patrick McEvay, and not otherwise transferred; which mortgage constitutes a cloud on the title.

The mortgage was given to secure the payment of Hennessey's note for $2,500 and any book accounts or other notes that might be due from McEvay to Hennessey. The mortgagor died May 3, 1873, leaving a widow, Catherine McEvay, and eight children. The widow was appointed administratrix on her husband's estate, and died about four months after

her husband.    The mortgage was transferred to her by Hennessey, by an instrument dated July 10, 1873, in consideration, as expressed in the instrument, of $8,012.58.    Patrick and Catherine both died intestate.    Their heirs and next of kin were their eight children.    No facts appear which would make it for the interest of the children that the mortgage should have been kept alive.    And in the absence of such facts it is well settled that the lien of the mortgage would be extinguished and the mortgage would be merged in the ownership of the equity of redemption.    *Knowles* v. *Carpenter*, 8 R. I. 553.

If it be urged that the mortgage would be assets in favor of a creditor of Catherine McEvay, and that a merger would not take place as against a creditor, we think it is a sufficient answer that it is not shown that there is any creditor.    More than twenty years have elapsed since the death of Catherine McEvay, so that any judgment even, obtained against her in her lifetime, would be barred.    As suggested by the commissioner, the only possible claim that could exist would be a judgment against her administrator.    No such judgment is shown.

The existence of any claim against Mrs. McEvay is extremely improbable.    She was a married woman for many years, and as such was incapable of contracting a debt.    She survived her husband only four months, during which she took up the mortgage in question.    After her death she had personal property remaining to the amount of upwards of $4,000, as shown by the account of the first administrator on her estate.    The probability that any creditor would have permitted his claim to slumber during all these years is too slight to be taken into consideration.    The cloud by reason of the mortgage is in our opinion too thin to afford any valid objection to the title.

We think the commissioner is entitled to an order in accordance with his motion.

*John W. Hogan*, for complainant.

*Charles A. Wilson, Thomas A. Jenckes & Richard E. Lyman*, for different respondents.